# UNITED STATES *v.* A PARCEL OF LAND, BUILD-INGS, APPURTENANCES, AND IMPROVEMENTS, KNOWN AS 92 BUENA VISTA AVENUE, RUMSON, NEW JERSEY, ET AL.

No. 91–781.   Argued October 13, 1992—Decided February 24, 1993

STEVENS, J., announced the judgment of the Court and delivered an opinion, in which BLACKMUN, O'CONNOR, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 131. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE, J., joined, *post*, p. 139.

*Amy L. Wax* argued the cause for the United States. With her on the briefs were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Roberts,* and *David T. Shelledy.*

*James A. Plaisted* argued the cause for the respondents. With him on the briefs was *Shalom D. Stone.**

*Briefs of *amici curiae* urging affirmance were filed for the American Bankers Association by *John J. Gill III* and *Michael F. Crotty;* for the American Land Title Association et al. by *David F. B. Smith;* and for the Federal Home Loan Mortgage Corp. by *Diane Marshall Ennist.*

*Robert A. Ginsburg* and *Thomas W. Logue* filed a brief for the Dade County Tax Collector et al. as *amici curiae.*

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which JUSTICE BLACKMUN, JUSTICE O'CONNOR, and JUSTICE SOUTER join.

The question presented is whether an owner's lack of knowledge of the fact that her home had been purchased with the proceeds of illegal drug transactions constitutes a defense to a forfeiture proceeding under the Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a), 84 Stat. 1276, as amended, 21 U. S. C. § 881(a)(6).[1]

## I

On April 3, 1989, the Government filed an *in rem* action against the parcel of land in Rumson, New Jersey, on which respondent's home is located. The verified complaint alleged that the property had been purchased in 1982 by respondent with funds provided by Joseph Brenna that were "the proceeds traceable to an [unlawful] exchange for a controlled substance," App. 13, and that the property was therefore subject to seizure and forfeiture under § 881(a)(6), *id.*, at 15.[2]

---

[1] The statute provides:

"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

.        .        .        .

"(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of [21 U. S. C. §§ 801–904], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."

[2] See n. 1, *supra.* The complaint also alleged that the property had been used in 1986 to facilitate the distribution of proceeds of an illegal

On April 12, 1989, in an *ex parte* proceeding, the District Court determined that there was probable cause to believe the premises were subject to forfeiture, and issued a summons and warrant for arrest authorizing the United States marshal to take possession of the premises. Respondent thereafter asserted a claim to the property, was granted the right to defend the action,[3] and filed a motion for summary judgment.

During pretrial proceedings, the following facts were established. In 1982, Joseph Brenna gave respondent approximately $240,000 to purchase the home that she and her three children have occupied ever since. Respondent is the sole owner of the property. From 1981 until their separation in 1987, she maintained an intimate personal relationship with Brenna. There is probable cause to believe that the funds used to buy the house were proceeds of illegal drug trafficking, but respondent swears that she had no knowledge of its origins.

---

drug transaction, and was therefore subject to forfeiture pursuant to § 881(a)(7), which provides:

"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

.        .        .        .        .

"(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."

No issue concerning the Government's claim under subparagraph (7) is presented before us.

[3] The United States Marshals Service entered into an agreement with respondent that allows her to remain in possession of the property pending the outcome of the litigation.

Among the grounds advanced in support of her motion for summary judgment was the claim that she was an innocent owner under § 881(a)(6). The District Court rejected this defense for two reasons: First, it ruled that "the innocent owner defense may only be invoked by those who can demonstrate that they are bona fide *purchasers for value*" (emphasis in original);[4] second, the court read the statute to offer the innocent owner defense only to persons who acquired an interest in the property before the acts giving rise to the forfeiture took place.[5]

Respondent was allowed to take an interlocutory appeal pursuant to 28 U. S. C. § 1292(b). One of the controlling questions of law presented to the Court of Appeals was:

"Whether an innocent owner defense may be asserted by a person who is not a bona fide purchaser for value concerning a parcel of land where the government has established probable cause to believe that the parcel of land was purchased with monies traceable to drug proceeds." 742 F. Supp. 189, 192 (NJ 1990).

Answering that question in the affirmative, the Court of Appeals remanded the case to the District Court to determine whether respondent was, in fact, an innocent owner.

---

[4] "I find that the claimant cannot successfully invoke the 'innocent owner' defense here, because she admits that she received the proceeds to purchase the premises as a *gift* from Mr. Brenna. More particularly, I find that where, as here, the government has demonstrated probable cause to believe that property is traceable to proceeds from drug transactions, the innocent owner defense may only be invoked by those who can demonstrate that they are bona fide *purchasers for value*." 738 F. Supp. 854, 860 (NJ 1990).

[5] "In particular, the 'innocent owner defense' at issue provides that 'no property shall be forfeited . . . to the extent of the interest of *an owner*, by reason of any act or omission . . . committed or omitted without the knowledge or consent of *that owner*.' 21 U. S. C. § 881(a)(6) (emphasis supplied). This language implies that the acts or omissions giving rise to forfeiture must be committed *after* the third party acquires a legitimate ownership interest in the property." *Ibid.* (emphasis in original).

The Court of Appeals refused to limit the innocent owner defense to bona fide purchasers for value because the plain language of the statute contains no such limitation,[6] because it read the legislative history as indicating that the term "owner" should be broadly construed,[7] and because the difference between the text of § 881(a)(6) and the text of the criminal forfeiture statute evidenced congressional intent not to restrict the civil section in the same way.[8]

The Court of Appeals also rejected the argument that respondent could not be an innocent owner unless she acquired the property before the drug transaction occurred. In advancing that argument the Government had relied on the "relation back" doctrine embodied in § 881(h), which provides that "[a]ll right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section." The court held that the relation back doctrine applied only to "property described in subsection (a)" and that the property at issue would not fit that description if respondent could establish her innocent owner defense. The court concluded that the Government's interpretation of § 881(h) "would essentially serve to emasculate the innocent owner defense provided for in section 881(a)(6). No one ob-

---

[6] "Despite the appeal of this analysis, the plain language of the innocent owner provision speaks only in terms of an 'owner' and in no way limits the term 'owner' to a bona fide purchaser for value." 937 F. 2d 98, 101 (CA3 1991).

[7] "Furthermore, in United States v. Parcel of Real Property Known as 6109 Grubb Road, 886 F. 2d 618 (3d Cir. 1989), we determined, after reviewing the legislative history of section 881(a)(6), that 'the term "owner" should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized.' Id. at 625 n. 4 (quoting 1978 U. S. Code Cong. & Admin. News at 9522–23)." Id., at 101–102.

[8] "Moreover, as the district court pointed out, the criminal forfeiture statute, section 853, is explicitly limited to bona fide purchasers for value, while in section 881 Congress omitted such limiting language. We believe that such a difference was intended by Congress." Ibid.

taining property after the occurrence of the drug transaction—including a bona fide purchase for value—would be eligible to offer an innocent owner defense on his behalf." 937 F. 2d 98, 102 (CA3 1991).

The conflict between the decision of the Court of Appeals and decisions of the Fourth and Tenth Circuits, see *In re One 1985 Nissan,* 889 F. 2d 1317 (CA4 1989); *Eggleston* v. *Colorado,* 873 F. 2d 242, 245–248 (CA10 1989), led us to grant certiorari, 503 U. S. 905 (1992). We now affirm.

## II

Laws providing for the official seizure and forfeiture of tangible property used in criminal activity have played an important role in the history of our country. Colonial courts regularly exercised jurisdiction to enforce English and local statutes authorizing the seizure of ships and goods used in violation of customs and revenue laws.[9] Indeed, the misuse

---

[9] "Long before the adoption of the Constitution the common law courts in the Colonies—and later in the states during the period of Confederation—were exercising jurisdiction *in rem* in the enforcement of forfeiture statutes. Like the Exchequer, in cases of seizure on navigable waters they exercised a jurisdiction concurrently with the courts of admiralty. But the vice-admiralty courts in the Colonies did not begin to function with any real continuity until about 1700 or shortly afterward. See Andrews, Vice-Admiralty Courts in the Colonies, in Records of the Vice-Admiralty Court of Rhode Island, 1617–1752 (ed. Towle, 1936), p. 1; Andrews, The Colonial Period of American History, vol. 4, ch. 8; Harper, The English Navigation Laws, ch. 15; Osgood, the American Colonies in the 18th Century, vol. 1, pp. 185–222, 299–303. By that time, the jurisdiction of common law courts to condemn ships and cargoes for violation of the Navigation Acts had been firmly established, apparently without question, and was regularly exercised throughout the colonies. In general the suits were brought against the vessel or article to be condemned, were tried by jury, closely followed the procedure in Exchequer, and if successful resulted in judgments of forfeiture or condemnation with a provision for

of the hated general warrant is often cited as an important cause of the American Revolution.[10]

The First Congress enacted legislation authorizing the seizure and forfeiture of ships and cargos involved in customs offenses.[11] Other statutes authorized the seizure of ships engaged in piracy.[12] When a ship was engaged in acts of "piratical aggression," it was subject to confiscation notwithstanding the innocence of the owner of the vessel.[13]

---

sale." *C. J. Hendry Co.* v. *Moore,* 318 U. S. 133, 139–140 (1943) (footnotes omitted).

[10] Writing for the Court in *Stanford* v. *Texas,* 379 U. S. 476, 481–482 (1965), Justice Stewart explained: "Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. "Then and there," said John Adams, "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born."' *Boyd* v. *United States,* 116 U. S. 616, 625."

[11] See, *e. g.,* §§ 12, 36, 1 Stat. 39, 47; §§ 13, 14, 22, 27, 67, 1 Stat. 157–159, 161, 163–164, 176.

[12] See *The Palmyra,* 12 Wheat. 1, 8 (1827).

[13] "The next question is, whether the innocence of the owners can withdraw the ship from the penalty of confiscation under the act of Congress. Here, again, it may be remarked that the act makes no exception whatsoever, whether the aggression be with or without the co-operation of the owners. The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. The vessel or boat (says the act of Congress) from which such piratical aggression, &c., shall have been first attempted or made shall be

Later statutes involved the seizure and forfeiture of distilleries and other property used to defraud the United States of tax revenues from the sale of alcoholic beverages. See, *e. g., United States* v. *Stowell*, 133 U. S. 1, 11–12 (1890). In these cases, as in the piracy cases, the innocence of the owner of premises leased to a distiller would not defeat a decree of condemnation based on the fraudulent conduct of the lessee.[14]

---

condemned. Nor is there any thing new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offense has been done as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party. The doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws; and has been applied to other kindred cases, such as cases arising on embargo and nonintercourse acts. In short, the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." *Harmony* v. *United States*, 2 How. 210, 233–234 (1844).

[14] "Beyond controversy, the title of the premises and property was in the claimant; and it is equally certain that he leased the same to the lessee for the purposes of a distillery, and with the knowledge that the lessee intended to use the premises to carry on that business, and that he did use the same for that purpose.

"Fraud is not imputed to the owner of the premises; but the evidence and the verdict of the jury warrant the conclusion that the frauds charged in the information were satisfactorily proved, from which it follows that the decree of condemnation is correct, if it be true, as heretofore explained, that it was the property and not the claimant that was put to trial under the pleadings; and we are also of the opinion that the theory adopted by the court below, that, if the lessee of the premises and the operator of the distillery committed the alleged frauds, the government was entitled to a verdict, even though the jury were of the opinion that the claimant was ignorant of the fraudulent acts or omissions of the distiller." *Dobbins's Distillery* v. *United States*, 96 U. S. 395, 403–404 (1878).

In all of these early cases the Government's right to take possession of property stemmed from the misuse of the property itself. Indeed, until our decision in *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294 (1967), the Government had power to seize only property that " 'the private citizen was not permitted to possess.' " [15] The holding in that case that the Fourth Amendment did not prohibit the seizure of "mere evidence" marked an important expansion of governmental power. See *Zurcher* v. *Stanford Daily*, 436 U. S. 547, 577–580 (1978) (STEVENS, J., dissenting).

The decision by Congress in 1978 to amend the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236, to authorize the seizure and forfeiture of proceeds of illegal drug transactions, see 92 Stat. 3777, also marked an important expansion of governmental power.[16] Before that amendment, the statute had authorized forfeiture of only the

---

[15] "Thus stolen property—the fruits of crime—was always subject to seizure. And the power to search for stolen property was gradually extended to cover 'any property which the private citizen was not permitted to possess,' which included instrumentalities of crime (because of the early notion that items used in crime were forfeited to the State) and contraband. Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 475. No separate governmental interest in seizing evidence to apprehend and convict criminals was recognized; it was required that some property interest be asserted. The remedial structure also reflected these dual premises. Trespass, replevin, and the other means of redress for persons aggrieved by searches and seizures, depended upon proof of a superior property interest. And since a lawful seizure presupposed a superior claim, it was inconceivable that a person could recover property lawfully seized." *Warden* v. *Hayden*, 387 U. S., at 303–304.

[16] A precedent for this expansion had been established in 1970 by the Racketeer Influenced and Corrupt Organizations Act (RICO), see 18 U. S. C. § 1963(a). Even RICO, however, did not specifically provide for the forfeiture of "proceeds" until 1984, when Congress added § 1963(a)(3) to resolve any doubt whether it intended the statute to reach so far. See S. Rep. No. 98–225, pp. 191–200 (1983); *Russello* v. *United States*, 464 U. S. 16 (1983).

illegal substances themselves and the instruments by which they were manufactured and distributed.[17]   The original forfeiture provisions of the 1970 statute had closely paralleled the early statutes used to enforce the customs laws, the piracy laws, and the revenue laws: They generally authorized the forfeiture of property used in the commission of criminal activity, and they contained no innocent owner defense. They applied to stolen goods, but they did not apply to proceeds from the sale of stolen goods.   Because the statute, after its 1978 amendment, does authorize the forfeiture of such proceeds and also contains an express and novel protec-

---

[17] Section 511(a) of the 1970 Act, 84 Stat. 1276, provided:

"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

"(1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this title.

"(2) All raw materials, products, and equipment of any kind which are used, or intended for use, in manufacturing, compounding, processing, delivering, importing, or exporting any controlled substance in violation of this title.

"(3) All property which is used, or intended for use, as a container for property described in paragraph (1) or (2).

"(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2), except that—

"(A) no conveyance used by any person as a common carrier in the transaction of business as a common carrier shall be forfeited under the provisions of this section unless it shall appear that the owner or other person in charge of such conveyance was a consenting party or privy to a violation of this title or title III; and

"(B) no conveyance shall be forfeited under the provisions of this section by reason of any act or omission established by the owner thereof to have been committed or omitted by any person other than such owner while such conveyance was unlawfully in the possession of a person other than the owner in violation of the criminal laws of the United States, or of any State.

"(5) All books, records, and research, including formulas, microfilm, tapes, and data which are used, or intended for use, in violation of this title."

tion for innocent owners, we approach the task of construing it with caution.

### III

The Court of Appeals correctly concluded that the protection afforded to innocent owners is not limited to bona fide purchasers. The text of the statute is the strongest support for this conclusion. The statute authorizes the forfeiture of moneys exchanged for a controlled substance, and "all proceeds traceable to such an exchange," with one unequivocal exception:

> "[N]o property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U. S. C. § 881(a)(6).

The term "owner" is used three times and each time it is unqualified. Such language is sufficiently unambiguous to foreclose any contention that it applies only to bona fide purchasers. Presumably that explains why the Government does not now challenge this aspect of the Court of Appeals' ruling.

That the funds respondent used to purchase her home were a gift does not, therefore, disqualify respondent from claiming that she is an owner who had no knowledge of the alleged fact that those funds were "proceeds traceable" to illegal sales of controlled substances. Under the terms of the statute, her status would be precisely the same if, instead of having received a gift of $240,000 from Brenna, she had sold him a house for that price and used the proceeds to buy the property at issue.

### IV

Although the Government does not challenge our interpretation of the statutory term "owner," it insists that respondent is not the "owner" of a house she bought in 1982 and has lived in ever since. Indeed, it contends that she never has

been the owner of this parcel of land because the statute vested ownership in the United States at the moment when the proceeds of an illegal drug transaction were used to pay the purchase price. In support of its position, the Government relies on both the text of the 1984 amendment to the statute and the common-law relation back doctrine. We conclude, however, that neither the amendment nor the common-law rule makes the Government an owner of property before forfeiture has been decreed.

In analyzing the Government's relation back argument, it is important to remember that respondent invokes the innocent owner defense against a claim that *proceeds* traceable to an illegal transaction are forfeitable. The Government contends that the money that Brenna received in exchange for narcotics became Government property at the moment Brenna received it and that respondent's house became Government property when that tainted money was used in its purchase. Because neither the money nor the house could have constituted forfeitable proceeds until after an illegal transaction occurred, the Government's submission would effectively eliminate the innocent owner defense in almost every imaginable case in which proceeds could be forfeited. It seems unlikely that Congress would create a meaningless defense. Moreover, considering that a logical application of the Government's submission would result in the forfeiture of property innocently acquired by persons who had been paid with illegal proceeds for providing goods or services to drug traffickers,[18] the burden of persuading us that Congress intended such an inequitable result is especially heavy.

---

[18] At oral argument the Government suggested that a narrow interpretation of the word "proceeds" would "probably" prevent this absurdity. See Tr. of Oral Arg. 27. The Government's brief, however, took the unequivocal position that the statute withholds the innocent owner defense from anyone who acquires proceeds after the illegal transaction took place. See Brief for United States 10, 21, 25, 27.

The Government recognizes that the 1984 amendment did not go into effect until two years after respondent acquired the property at issue in this case. It therefore relies heavily on the common-law relation back doctrine applied to *in rem* forfeitures. That doctrine applied the fiction that property used in violation of law was itself the wrongdoer that must be held to account for the harms it had caused.[19] Because the property, or "res," was treated as the wrongdoer, it was appropriate to regard it as the actual party to the *in rem* forfeiture proceeding. Under the relation back doctrine, a decree of forfeiture had the effect of vesting title to the offending res in the Government as of the date of its offending conduct. Because we are not aware of any common-law precedent for treating proceeds traceable to an unlawful exchange as a fictional wrongdoer subject to forfeiture, it is not entirely clear that the common-law relation back doctrine is applicable. Assuming that the doctrine does apply, however, it is nevertheless clear that under the common-law rule the fictional and retroactive vesting was not self-executing.

Chief Justice Marshall explained that forfeiture does not automatically vest title to property in the Government:

> "It has been proved, that in all forfeitures accruing at common law, nothing vests in the government until some legal step shall be taken for the assertion of its right, after which, for many purposes, the doctrine of relation carries back the title to the commission of the offence." *United States* v. *Grundy*, 3 Cranch 337, 350–351 (1806).[20]

---

[19] See *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 680–684 (1974).

[20] In his dissent, JUSTICE KENNEDY advocates the adoption of a new common-law rule that would avoid the need to construe the terms of the statute that created the Government's right to forfeit proceeds of drug transactions. Under his suggested self-executing rule, patterned after an amalgam of the law of trusts and the law of secured transactions, the Government would be treated as the owner of a secured or beneficial interest in forfeitable proceeds even before a decree of forfeiture is entered. The various authorities that he cites support the proposition that *if* such

The same rule applied when a statute (a statute that contained no specific relation back provision) authorized the forfeiture. In a passage to which the Government has referred us,[21] we stated our understanding of how the Government's title to forfeited property relates back to the moment of forfeitability:

> "By the settled doctrine of this court, whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, *although their title is not perfected until judicial condemnation;* the forfeiture constitutes a statutory transfer of the right to the United States at the time the offence is committed; and

---

an interest exists, it may be extinguished by a sale to a bona fide purchaser; they provide no support for the assumption that such an interest springs into existence independently. As a matter of common law, his proposal is inconsistent with Chief Justice Marshall's statement that "nothing vests in the government until some legal step shall be taken," and with the cases cited by JUSTICE SCALIA, *post,* at 132. As a matter of statutory law, it is improper to rely on § 881(a) as the source of the Government's interest in proceeds without also giving effect to the statutory language defining the scope of that interest. That a statutory provision contains "puzzling" language, or seems unwise, is not an appropriate reason for simply ignoring its text.

JUSTICE KENNEDY's dramatic suggestion that our construction of the 1984 amendment "rips out," *post,* at 145, the "centerpiece of the Nation's drug enforcement laws," *post,* at 144, rests on what he characterizes as the "safe" assumption that the innocent owner defense would be available to "an associate" of a criminal who could "shelter the proceeds from forfeiture, to be reacquired once he is clear from law enforcement authorities," *ibid.* As a matter of fact, forfeitable proceeds are much more likely to be possessed by drug dealers themselves than by transferees sufficiently remote to qualify as innocent owners; as a matter of law, it is quite clear that neither an "associate" in the criminal enterprise nor a temporary custodian of drug proceeds would qualify as an innocent owner; indeed, neither would a sham bona fide purchaser.

[21] See Pet. for Cert. 9–10; Brief for United States 17.

the condemnation, *when obtained,* relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith." *United States* v. *Stowell,* 133 U. S., at 16–17 (emphases added).

If the Government wins a judgment of forfeiture under the common-law rule—which applied to common-law forfeitures and to forfeitures under statutes without specific relation back provisions—the vesting of its title in the property relates back to the moment when the property became forfeitable. Until the Government does win such a judgment, however, someone else owns the property. That person may therefore invoke any defense available to the owner of the property before the forfeiture is decreed.

In this case a statute allows respondent to prove that she is an innocent owner. And, as the Chief Justice further explained in *Grundy,* if a forfeiture is authorized by statute, "the rules of the common law may be dispensed with," 3 Cranch, at 351. Congress had the opportunity to dispense with the common-law doctrine when it enacted § 881(h); as we read that subsection, however, Congress merely codified the common-law rule. Because that rule was never applied to the forfeiture of proceeds, and because the statute now contains an innocent owner defense, it may not be immediately clear that they lead to the same result.

The 1984 amendment provides:

> "All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section." 21 U. S. C. § 881(h).

Because proceeds traceable to illegal drug transactions are a species of "property described in subsection (a)," the Government argues that this provision has the effect of preventing such proceeds from becoming the property of anyone other than the United States. The argument fails.

Although proceeds subject to § 881(h) are "described" in the first part of subsection (a)(6), the last clause of that subsection exempts certain proceeds—proceeds owned by one unaware of their criminal source—from forfeiture. As the Senate Report on the 1984 amendment correctly observed, the amendment applies only to "property which is subject to civil forfeiture under section 881(a)."[22] Under § 881(a)(6), the property of one who can satisfy the innocent owner defense is not subject to civil forfeiture. Because the success of any defense available under § 881(a) will necessarily determine whether § 881(h) applies, § 881(a)(6) must allow an assertion of the defense *before* § 881(h) applies.[23]

---

[22] The Report provides:

"Section 306 also adds two new subsections at the end of section 881. The first provides that all right, title, and interest in *property which is subject to civil forfeiture under section 881(a)* vests in the United States upon the commission of the acts giving rise to the forfeiture." S. Rep. No. 98–225, p. 215 (1983) (emphasis added).

[23] The logic of the Government's argument would apparently apply as well to the innocent owner defense added to the statute in 1988. That amendment provides, in part:

"[N]o conveyance shall be forfeited under this paragraph to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner." § 6075(3)(C), 102 Stat. 4324. That amendment presumably was enacted to protect lessors like the owner whose yacht was forfeited in a proceeding that led this Court to observe:

"It therefore has been implied that it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent. See, [*Peisch* v. *Ware,* 4 Cranch 347, 364 (1808)]; *Goldsmith-Grant Co.* v. *United States,* 254 U. S., at 512; *United States* v. *One Ford Coupe Automobile,* 272 U. S., at 333; *Van Oster* v. *Kansas,* 272 U. S., at 467. Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for, in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive. Cf. *Armstrong* v.

Therefore, when Congress enacted this innocent owner defense, and then specifically inserted this relation back provision into the statute, it did not disturb the common-law rights of either owners of forfeitable property or the Government. The common-law rule had always allowed owners to invoke defenses made available to them *before* the Government's title vested, and after title *did* vest, the common-law rule had always related that title back to the date of the commission of the act that made the specific property forfeitable. Our decision denies the Government no benefits of the relation back doctrine. The Government cannot profit from the common-law doctrine of relation back until it has obtained a judgment of forfeiture. And it cannot profit from the statutory version of that doctrine in § 881(h) until respondent has had the chance to invoke and offer evidence to support the innocent owner defense under § 881(a)(6).

## V

As a postscript we identify two issues that the parties have addressed, but that need not be decided.

The Government has argued that the Court of Appeals' construction of the statute is highly implausible because it would enable a transferee of the proceeds of an illegal exchange to qualify as an innocent owner if she was unaware of the illegal transaction when it occurred but learned about it before she accepted the forfeitable proceeds. Respondent disputes this reading of the statute and argues that both legislative history and common sense suggest that the transferee's lack of knowledge must be established as of the time the proceeds at issue are transferred.[24] Moreover, whether

---

*United States*, 364 U. S. 40, 49 (1960)." *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S., at 689–690 (footnote omitted).

[24] See Brief for Respondent 31–32, 37–38; Tr. of Oral Arg. 38. The several *amici* make the same point, see Brief for American Bankers Association as *Amicus Curiae* 15; Brief for Federal Home Loan Mortgage Corpo-

or not the text of the statute is sufficiently ambiguous to justify resort to the legislative history, equitable doctrines may foreclose the assertion of an innocent owner defense by a party with guilty knowledge of the tainted character of the property. In all events, we need not resolve this issue in this case; respondent has assumed the burden of convincing the trier of fact that she had no knowledge of the alleged source of Brenna's gift in 1982, when she received it.[25] In its order denying respondent's motion for summary judgment, the District Court assumed that respondent could prove what she had alleged, as did the Court of Appeals in allowing the interlocutory appeal from that order. We merely decide, as did both of those courts, whether her asserted defense was insufficient as a matter of law.[26]

At oral argument, the Government also suggested that the statutory reference to "all proceeds traceable to such an exchange" is subject to a narrowing construction that might avoid some of the harsh consequences suggested in the various *amici* briefs expressing concerns about the impact of the statute on real estate titles. See Tr. of Oral Arg. 5–10, 19–25. If a house were received in exchange for a quantity of illegal substances and that house were in turn exchanged for another house, would the traceable proceeds consist of the first house, the second house, or both, with the Government having an election between the two? Questions of this char-

---

ration as *Amicus Curiae* 11–12; Brief for American Land Title Association et al. as *Amici Curiae* 11–12; Brief for Dade County Tax Collector et al. as *Amici Curiae* 16–17.

[25] "The statute should be read to require that the owner assert his lack of knowledge of the criminal transaction at the time of the transfer. Since Goodwin did not have any knowledge of the alleged criminal transaction until long after the transfer, she should be protected by the innocent owner clause." Brief for Respondent 37–38.

[26] If she can show that she was unaware of the illegal source of the funds at the time Brenna transferred them to her, then she was necessarily unaware that they were the profits of an illegal transaction at the time of the transaction itself.

acter are not embraced within the issues that we granted certiorari to resolve, however, and for that reason, see *Yee* v. *Escondido*, 503 U. S. 519, 535–538 (1992), we express no opinion concerning the proper construction of that statutory term.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I am in accord with much of the plurality's reasoning, but cannot join its opinion for two reasons. First, while I agree that the "innocent owner" exception in this case produces the same result as would an "innocent owner" exception to traditional common-law forfeiture (with its relation-back principle), I do not reach that conclusion through the plurality's reading of the phrase "property described in subsection (a)," see *ante*, at 127–129, which seems to me implausible. Second, I see no proper basis for the plurality's concluding that "respondent has assumed the burden of convincing the trier of fact that she had no knowledge of the alleged source of Brenna's gift in 1982, when she received it," *ante*, at 130.

I

The Government's argument in this case has rested on the fundamental misconception that, under the common-law relation-back doctrine, all rights and legal title to the property pass to the United States "at the moment of illegal use." Brief for United States 16. Because the Government believes that the doctrine operates at the time of the illegal act, it finds the term "relation *back*" to be "something of a misnomer." *Ibid.* But the name of the doctrine is not wrong; the Government's understanding of it is. It is a doctrine of *retroactive* vesting of title that operates only upon entry of the judicial order of forfeiture or condemnation: "[T]he decree of condemnation when entered relates back to

the time of the commission of the wrongful acts, and takes date from the wrongful acts and not from the date of the sentence or decree." *Henderson's Distilled Spirits*, 14 Wall. 44, 56 (1872). "While, under the statute in question, a judgment of forfeiture relates back to the date of the offense as proved, that result follows only from an effective judgment of condemnation." *Motlow* v. *State ex rel. Koeln*, 295 U. S. 97, 99 (1935). The relation-back rule applies only "in cases where the [Government's] title ha[s] been consummated by seizure, suit, and judgment, or decree of condemnation," *Confiscation Cases*, 7 Wall. 454, 460 (1869), whereupon "the doctrine of relation *carries back* the title to the commission of the offense," *United States* v. *Grundy*, 3 Cranch 337, 350–351 (1806) (Marshall, C. J.) (emphasis added). See also *United States* v. *Stowell*, 133 U. S. 1, 16–17 (1890), quoted *ante*, at 126–127.

Though I disagree with the Government as to the meaning of the common-law doctrine, I agree with the Government that the doctrine is embodied in the statute at issue here. The plurality, if I understand it correctly, does not say that, but merely asserts that in the present case the consequence of applying the statutory language is to produce the same result that an "innocent owner" exception under the common-law rule would produce. Title 21 U. S. C. § 881(h) provides: "All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section." The plurality would read the phrase "property described in subsection (a)" as not encompassing any property that is protected from forfeiture by the "innocent owner" provision of § 881(a)(6). It proceeds to reason that since, therefore, the application of subsection (a)(6) must be determined *before* subsection (h) can be fully applied, respondent must be considered an "owner" under that provision—just as she would have been considered an "owner" (prior to decree of forfeiture) at common law.

I would not agree with the plurality's conclusion, even if I agreed with the premises upon which it is based. The fact that application of subsection (a)(6) must be determined before subsection (h) can be fully applied simply does not establish that the word "owner" in subsection (a)(6) must be deemed to include (as it would at common law) anyone who held title prior to the actual decree of forfeiture. To assume that is simply to beg the question. Besides the fact that its conclusion is a non sequitur, the plurality's premises are mistaken. To begin with, the innocent-owner provision in subsection (a)(6) does *not* insulate any "property described" in subsection (a)(6) from forfeiture; it protects only the "interest" of certain owners in *any* of the described property. But even if it could be regarded as insulating some "property described" from forfeiture, that property would still be covered by subsection (h), which refers to "property *described*," not "property *forfeited*." In sum, I do not see how the plurality can, solely by focusing on the phrase "property described in subsection (a)," establish that the word "owner" in subsection (a) includes persons holding title after the forfeiture-producing offense.

The Government agrees with me that § 881(h) "covers all 'property described in subsection (a),' including property so described that is nonetheless exempted from forfeiture because of the innocent owner defense." Brief for United States 29. That position is quite incompatible, however, with the Government's contention that § 881(h) operates at the time of the wrongful act, since if both were true *no one* would be protected under the plain language of the innocent-owner provision. In the Government's view, the term "owner" in § 881(a)(6) refers to individuals "who owned the seized assets before those assets were ever tainted by involvement in drug transactions." *Id.,* at 21. But if § 881(h) operates immediately to vest in the Government legal title *to* all property described in § 881(a), even that class of "owners" would be immediately divested of their property

interests and would be at most "former owners" at the time of forfeiture proceedings. Because of this difficulty, the Government is forced to argue that the word "owner" in § 881(a)(6) should be interpreted to mean "former owner." Reply Brief for United States 5. Thus, if § 881(h) operates at the time of the illegal transaction as the Government contends, either the plain language of the innocent-owner provision must be slighted or the provision must be deprived of all effect. This problem does not exist if § 881(h) is read to be, not an unheard-of provision for immediate, undecreed, secret vesting of title in the United States, but rather an expression of the traditional relation-back doctrine—stating when title shall vest *if* forfeiture is decreed. On that hypothesis, the person holding legal title is genuinely the "owner" at the time (prior to the decree of forfeiture) that the court applies § 881(a)(6)'s innocent-owner provision.

I acknowledge that there is some textual difficulty with the interpretation I propose as well: § 881(h) says that title "shall vest in the United States upon commission of the act giving rise to forfeiture," and I am reading it to say that title "shall vest in the United States upon forfeiture, effective as of commission of the act giving rise to forfeiture." The former is certainly an imprecise way of saying the latter. But it is, I think, an imprecision one might expect in a legal culture familiar with retroactive forfeiture, and less of an imprecision than any of the other suggested interpretations require. Moreover, this interpretation locates the imprecision within a phrase where clear evidence of imprecision exists, since § 881(h)'s statement that "all right . . . shall vest in the United States" flatly contradicts the statement in § 881(a) that "[t]he following shall be *subject to forfeiture* to the United States." What the United States already owns cannot be forfeited to it.

This interpretation of § 881(h) is the only one that makes sense within the structure of the statutory forfeiture procedures. Subsection 881(d) provides that forfeitures under

§ 881 are governed by the procedures applicable to "summary and judicial forfeiture, and condemnation of property for violation of the customs laws," set forth in 19 U. S. C. § 1602 *et seq.* It is clear from these procedures that the Government does not gain title to the property until there is a decree of forfeiture. Section 1604, for example, requires the Attorney General to commence proceedings in district court where such proceedings are "necessary" "for the recovery" of a forfeiture. See *United States* v. *$8,850,* 461 U. S. 555, 557–558, and n. 2 (1983) (detailing circumstances requiring judicial forfeiture proceedings). If, however, legal title to the property actually vested in the United States at the time of the illegal act, judicial forfeiture proceedings would never be "necessary." Under the customs forfeiture procedures the United States can, in certain limited circumstances, obtain title to property by an Executive declaration of forfeiture. The statute provides that such an Executive "declaration of forfeiture . . . shall have the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding in a district court of the United States," and then specifies what that effect is: "Title *shall be deemed to vest* in the United States . . . from the date of the act for which the forfeiture was incurred." 19 U. S. C. § 1609(b) (emphasis added). Finally, if the Government's construction of § 881(h) were correct, the statute-of-limitations provision, 19 U. S. C. § 1621,[1] would need to state that title *reverts* to the former owners of the property, rather than (as it does) simply limit

---

[1] In the proceedings below, the Government argued that § 1621 was the relevant statute of limitations for § 881 and the Court of Appeals agreed. See Brief for United States, Plaintiff-Appellee in No. 90–5823 (CA3), pp. 19–23; App. to Pet. for Cert. 14a–15a. That ruling was not appealed and is consistent with other authority. See *United States* v. *One Parcel of Real Property, 2401 S. Claremont, Independence, Mo.,* 724 F. Supp. 670, 673 (WD Mo. 1989). See also *United States* v. *$8,850,* 461 U. S. 555, 563, n. 13 (1983) (forfeiture statute not specifying procedures to be used held to incorporate statute of limitations in § 1621).

the right of the United States to institute an "action to re-cover" a forfeiture.[2]

The traditional operation of the relation-back doctrine also explains the textual difference between § 881(a)(6)'s innocent-"owner" and § 853's innocent-"transferee" provisions—a difference on which the Government relies heavily. See Brief for United States 31–35; Reply Brief for United States 10–11. Section 853, which provides for forfeiture of drug-related assets in connection with criminal convictions, uses the term "transferee"—not "owner"—to protect the interests of persons who acquire property after the illegal act has occurred.[3] The Government contends that the reason for this variance is that the term "owner" simply does not cover persons acquiring interests after the illegal act. That explanation arrives under a cloud of suspicion, since it is impossible to imagine (and the Government was unable to suggest) *why* Congress would provide greater protection for postoffense owners (or "transferees") in the context of criminal forfeitures. The real explanation, I think, is that the term "owner" could not accurately be used in the context of

---

[2] Section 881(d) provides that the customs procedures are applicable only to the extent "not inconsistent with the provisions [of § 881]"—so one might argue that the provisions I have discussed in this paragraph, to the extent contrary to the Government's interpretation of § 881(h), are simply inapplicable. That disposition is theoretically possible but not likely, since it produces massive displacement of not merely the details but the fundamental structure of the referenced forfeiture procedures.

[3] Title 21 U. S. C. § 853(c) provides:

"All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section."

§ 853 because third parties can assert their property rights under that section only "[f]ollowing the entry of an order of forfeiture." 21 U. S. C. § 853(n). See also § 853(k) (prohibiting third parties from intervening to vindicate their property interests except as provided in subsection (n)). Thus, at the time the third-party interests are being adjudicated, the relation-back doctrine has already operated to carry back the title of the United States to the time of the act giving rise to the forfeiture, and the third parties have been divested of their property interests. See § 853(c) (codifying the relation-back principle for criminal forfeiture). Indeed, if the court finds that the transferee has a valid claim under the statute, it must "amend the order of forfeiture." § 853(n)(6).

The owner/transferee distinction is found in other provisions throughout the United States Code, and the traditional relation-back doctrine provides the only explanation for it. While Congress has provided for the protection of "owners" in many other forfeiture statutes, see, e. g., 15 U. S. C. § 715f(a) (allowing court to order the return of oil subject to forfeiture "to the owner thereof"); 16 U. S. C. § 2409(c) (permitting the "owner" of property seized for forfeiture to recover it, *pendente lite,* by posting bond); § 2439(c) (same); 18 U. S. C. § 512(a) (permitting the "owner" of motor vehicle with altered identification number to avoid forfeiture by proving lack of knowledge), it consistently protects "transferees" in criminal forfeiture statutes that follow the procedure set forth in § 853: forfeiture first, claims of third parties second. See 18 U. S. C. § 1467 (criminal forfeitures for obscenity); 18 U. S. C. § 1963 (1988 ed. and Supp. III) (criminal RICO forfeitures); 18 U. S. C. § 2253 (1988 ed. and Supp. III) (criminal forfeitures for sexual exploitation of children).[4]

---

[4] It is worth observing that, if the Government's view of the relation-back principle were correct, the protection provided for transferees in the last-mentioned statute would be utterly illusory. The property subject to forfeiture under 18 U. S. C. § 2253 (1988 ed. and Supp. III) is also covered by a parallel civil forfeiture statute that follows the pattern of § 881: It

I think the result reached today is correct because the relation-back principle recited in § 881(h) is the familiar, traditional one, and the term "owner" in § 881(a)(6) bears its ordinary meaning.

## II

I cannot join the plurality's conclusion that respondent has assumed the burden of proving that "she had no knowledge of the alleged source of Brenna's gift in 1982, when she received it." *Ante*, at 130. To support this, the plurality cites a passage from respondent's brief taking the position that the owner's lack of knowledge of the criminal activity should be tested "at the time of the transfer," Brief for Respondent 37–38. The fact of the matter is that *both* parties took positions before this Court that may be against their interests on remand. The Government may find inconvenient its contention that "the statutory test for innocence . . . looks to the claimant's awareness of the illegal acts giving rise to forfeiture at the time they occur." Reply Brief for United States 8. Which, if either, party will be estopped from changing position is an issue that we should not address for two simple reasons: (1) Neither party has yet attempted to change position. (2) The issue is not fairly included within the question on which the Court granted certiorari. (That question was, "Whether a person who receives a gift of money derived from drug trafficking and uses that money to purchase real property is entitled to assert an 'innocent owner' defense in an action seeking civil forfeiture of the real prop-

_____

protects only the rights of "owners," and has an express relation-back provision. See 18 U. S. C. §§ 2254(a), 2254(g) (1988 ed. and Supp. III). Under the Government's view, whenever the United States would be unable to obtain property through the criminal forfeiture mechanism because of the innocent-"transferee" defense, it could simply move against the same property in a civil forfeiture proceeding, which gives a defense only to "owners." See also 18 U. S. C. § 981 (1988 ed. and Supp. III) (civil forfeiture provision); 18 U. S. C. § 982 (1988 ed., Supp. III) (parallel criminal forfeiture statute incorporating by reference the procedures in 21 U. S. C. § 853).

erty." Pet. for Cert. i. The plurality's reformulation of the question in the first sentence of the opinion is inexplicable.)

This question of the relevant time for purposes of determining knowledge was not a separate issue in the case, but arose indirectly, by way of argumentation on the relation-back point. The Government argued that since (as it believed) knowledge had to be measured at the time of the illegal act, § 881(h) must be interpreted to vest title in the United States immediately, because otherwise the statute would produce the following "untenable result": A subsequent owner who knew of the illegal act at the time he acquired the property, but did not know of it at the time the act was committed, would be entitled to the innocent-owner defense. Brief for United States 25. That argument can be rejected by deciding *either* that the Government's view of the timing of knowledge is wrong, *or* that, even if it may be right, the problem it creates is not so severe as to compel a ruling for the Government on the relation-back issue. (I take the latter course: I do not find inconceivable the possibility that post-illegal-act transferees with post-illegal-act knowledge of the earlier illegality are provided a defense against forfeiture. The Government would still be entitled to the property held by the drug dealer and by close friends and relatives who are unable to meet their burden of proof as to ignorance of the illegal act when it occurred.) But it entirely escapes me how the Government's argument, an argument *in principle*, can be answered by simply saying that, in the present case, respondent has committed herself to prove that she had no knowledge of the source of the funds at the time she received them.

For the reasons stated, I concur in the judgment.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

Once this case left the District Court, the appellate courts and all counsel began to grapple with the wrong issue, one

that need not be addressed. The right question, I submit, is not whether the donee's ownership meets the statutory test of innocence. 21 U. S. C. § 881(a)(6). Instead, the threshold and dispositive inquiry is whether the donee had any ownership rights that required a separate forfeiture, given that her title was defective and subject to the Government's claim from the outset. We must ask whether a wrongdoer holding a forfeitable asset, property in which the United States has an undoubted superior claim, can defeat that claim by a transfer for no value. Under settled principles of property transfers, trusts, and commercial transactions, the answer is no. We need not address the donee's position except to acknowledge that she has whatever right the donor had, a right which falls before the Government's superior claim. In this case, forfeiture is determined by the title and ownership of the asset in the hands of the donor, not the donee. The position of respondent as the present holder of the asset and her knowledge, or lack of knowledge, regarding any drug offenses are, under these facts, but abstract inquiries, unnecessary to the resolution of the case.

## I

We can begin with the state of affairs when the alleged drug dealer held the funds he was later to transfer to respondent. Those moneys were proceeds of unlawful drug transactions and in the dealer's hands were, without question, subject to forfeiture under § 881(a)(6). The dealer did not just know of the illegal acts; he performed them. As the case is presented to us, any defense of his based on lack of knowledge is not a possibility. As long as the dealer held the illegal asset, it was subject to forfeiture and to the claim of the United States, which had a superior interest in the property.

Suppose the drug dealer with unlawful proceeds had encountered a swindler who, knowing nothing of the dealer's

drug offenses, defrauded him of the forfeitable property. In an action by the Government against the property, it need not seek to forfeit any ownership interest of the swindler. In the *in rem* proceeding the Government would need to establish only the forfeitable character of the property in the hands of the dealer and then trace the property to the swindler who, having no higher or better title to interpose, must yield to the Government's interest. In this context we would not entertain an argument that the swindler could keep the property because he had no knowledge of the illegal drug transaction. The defect in title arose in the hands of the first holder and was not eliminated by the transfer procured through fraud. Thus the only possible "interest of an owner," § 881(a)(6), that the swindler could hold was one inferior to the interest of the United States.

Here, of course, the holder is a donee, not a swindler, but the result is the same. As against a claimant with a superior right enforceable against the donor, a donee has no defense save as might exist, say, under a statute of limitations. The case would be different, of course, if the donee had in turn transferred the property to a bona fide purchaser for full consideration. The voidable title in the asset at that point would become unassailable in the purchaser, subject to any heightened rules of innocence the Government might lawfully impose under the forfeiture laws. But there is no bona fide purchaser here.

The matter not having been argued before us in these terms, perhaps it is premature to say whether the controlling law for transferring and tracing property rights of the United States under § 881 is federal common law, see *Boyle* v. *United Technologies Corp.*, 487 U. S. 500 (1988); *Clearfield Trust Co.* v. *United States*, 318 U. S. 363 (1943), or the law of the State governing the transfer under normal conflict-of-law rules, which here appears to be New Jersey. That matter could be explored on remand if the parties thought any-

thing turned upon it, though the result likely would be the same under either source of law because the controlling principles are so well settled.

The controlling principles are established by the law of voidable title, a centuries-old concept now codified in 49 States as part of their adoption of the Uniform Commercial Code. 1 J. White & R. Summers, Uniform Commercial Code 1, 186–191 (3d ed. 1988). These principles should control the inquiry into whether property once "subject to forfeiture to the United States," § 881(a), remains so after subsequent transactions. Cf. R. Brown, Personal Property § 70, pp. 237–238 (2d ed. 1955); Restatement (Second) of Trusts §§ 284, 287, 289, pp. 47–48, 54–56 (1959); Restatement (Second) of Property § 34.9, p. 338 (1992). The primary rules of voidable title are manageable and few in number. The first is that one who purchases property in good faith and for value from the holder of voidable title obtains good title. The second rule, reciprocal to the first, is that one who acquires property from a holder of voidable title other than by a good-faith purchase for value obtains nothing beyond what the transferor held. The third rule is that a transferee who acquires property from a good-faith purchaser for value or one of his lawful successors obtains good title, even if the transferee did not pay value or act in good faith. See Ames, Purchase for Value Without Notice, 1 Harv. L. Rev. 1 (1887); Uniform Commercial Code § 2–403(1) (Official Draft 1978); Uniform Commercial Code § 2–403(1) (Official Draft 1957); Uniform Commercial Code § 2–403(1) (Official Draft 1952). See also 4 A. Scott & W. Fratcher, Law of Trusts §§ 284–289, pp. 35–70 (4th ed. 1989); Searey, Purchase for Value Without Notice, 23 Yale L. J. 447 (1914).

Applying these rules to a transferee of proceeds from a drug sale, it follows that the transferee must be, or take from, a bona fide purchaser for value to assert an innocent owner defense under § 881(a)(6). Bona fide purchasers for value or their lawful successors, having engaged in or bene-

fited from a transaction that the law accepts as capable of creating property rights instead of merely transferring possession, are entitled to test their claim of ownership under § 881(a)(6) against what the Government alleges to be its own superior right. The outcome, that one who had defective title can create good title in the new holder by transfer for value, is not to be condemned as some bizarre surprise. This is not alchemy. It is the common law. See *Independent Coal & Coke Co.* v. *United States*, 274 U. S. 640, 647 (1927); *United States* v. *Chase Nat. Bank*, 252 U. S. 485, 494 (1920); *Wright-Blodgett Co.* v. *United States*, 236 U. S. 397, 403 (1915). By contrast, the donee of drug trafficking proceeds has no valid claim to the proceeds, not because she has done anything wrong but because she stands in the shoes of one who has. It is the nature of the donor's interest, which the donee has assumed, that renders the property subject to forfeiture. Cf. *Otis* v. *Otis*, 167 Mass. 245, 246, 45 N. E. 737 (1897) (Holmes, J.) ("A person to whose hands a trust fund comes by conveyance from the original trustee is chargeable as a trustee in his turn, if he takes it without consideration, whether he has notice of the trust or not. This has been settled for three hundred years, since the time of uses").

When the Government seeks forfeiture of an asset in the hands of a donee, its forfeiture claim rests on defects in the title of the asset in the hands of the donor. The transferee has no ownership superior to the transferor's which must be forfeited, so her knowledge of the drug transaction, or lack thereof, is quite irrelevant, as are the arcane questions concerning the textual application of § 881(a) to someone in a donee's position. The so-called innocent owner provisions of § 881(a)(6) have ample scope in other instances, say where a holder who once had valid ownership in property is alleged to have consented to its use to facilitate a drug transaction. Furthermore, whether respondent's marital rights were present value or an antecedent debt and whether either could provide the necessary consideration for a bona fide pur-

chase are questions that could be explored on remand, were my theory of the case to control.

## II

As my opening premise is so different from the one the plurality adopts, I do not address the difficult, and quite unnecessary, puzzles encountered in its opinion and in the opinion of JUSTICE SCALIA, concurring in the judgment. It is my obligation to say, however, that the plurality's 'opinion leaves the forfeiture scheme that is the centerpiece of the Nation's drug enforcement laws in quite a mess.

The practical difficulties created by the plurality's interpretation of § 881 are immense, and we should not assume Congress intended such results when it enacted § 881(a)(6). To start, the plurality's interpretation of § 881(a)(6) conflicts with the principal purpose we have identified for forfeiture under the Continuing Criminal Enterprise Act, which is "the desire to lessen the economic power of . . . drug enterprises." *Caplin & Drysdale, Chartered* v. *United States,* 491 U. S. 617, 630 (1989). When a criminal transfers drug transaction proceeds to a good-faith purchaser for value, one would presume he does so because he considers what he receives from the purchaser to be of equal or greater value than what he gives to the purchaser, or because he is attempting to launder the proceeds by exchanging them for other property of near equal value. In either case, the criminal's economic power is diminished by seizing from him whatever he received in the exchange with the good-faith purchaser. On the other hand, when a criminal transfers drug transaction proceeds to another without receiving value in return, he does so, it is safe to assume, either to use his new-found, albeit illegal, wealth to benefit an associate or to shelter the proceeds from forfeiture, to be reacquired once he is clear from law enforcement authorities. In these cases, the criminal's economic power cannot be diminished by seizing what he received in the donative exchange, for he received no tan-

gible value. If the Government is to drain the criminal's economic power, it must be able to pierce donative transfers and recapture the property given in the exchange. It is serious and surprising that the plurality today denies the Government the right to pursue the same ownership claims that under traditional and well-settled principles any other claimant or trust beneficiary or rightful owner could assert against a possessor who took for no value and who has no title or interest greater than that of the transferor.

Another oddity now given to us by the plurality's interpretation is that a gratuitous transferee must forfeit the proceeds of a drug deal if she knew of the drug deal before she received the proceeds but not if she discovered it a moment after. Yet in the latter instance, the donee, having given no value, is in no different position from the donee who had knowledge all along, save perhaps that she might have had a brief expectation the gift was clean. By contrast, the good-faith purchaser for value who, after an exchange of assets, finds out about his trading partner's illegal conduct has undergone a significant change in circumstances: He has paid fair value for those proceeds in a transaction which, as a practical matter in most cases, he cannot reverse.

## III

The statutory puzzle the plurality and concurrence find so engaging is created because of a false premise, the premise that the possessor of an asset subject to forfeiture does not stand in the position of the transferor but must be charged with some guilty knowledge of her own. Forfeiture proceedings, though, are directed at an asset, and a donee in general has no more than the ownership rights of the donor. By denying this simple principle, the plurality rips out the most effective enforcement provisions in all of the drug forfeiture laws. I would reverse the judgment of the Court of Appeals, and with all due respect, I dissent from the judgment of the Court.